Remember, we have a time clock system. When a yellow light comes on, you have two more minutes in your argument. When the red light comes on, we ask you to conclude your remarks unless you're answering a question from the court. We also are familiar with the briefs and record excerpts, but we have probably not read the entire record, so we appreciate those citations whenever you think they're appropriate. And with that, we call the first case, number 24-10515, United States v. Hall, and we'll hear from Mr. Kline. Good morning, and may it please the court. My name is John Kline, and I represent the appellant, Richard Hall. This case presents three issues concerning the anti-kickback statute, the burden of persuasion on the safe harbors, the proper definition of the term employee and the employee safe harbor, and the significance of the Marchetti and Miles decisions, Marchetti being very recent, Miles being an older case, and what those cases mean in terms of the scope of the anti-kickback statute. I'd like to touch on each of those issues, but of course, I'll be guided by the court's questions. Let me start with the burden of persuasion on the safe harbors. We're talking about the employee safe harbor, but I think the argument applies to all the safe harbors. And there's a lot of common ground here. It is undisputed that the safe harbors are not elements of the anti-kickback statute offense. It's undisputed that they are affirmative defenses. It's undisputed that the defendant has the burden of production on all of the safe harbors. And those points essentially resolve a lot of the issues that are discussed in the cases that have addressed the safe harbors. It's also undisputed that Mr. Hall satisfied his burden of production under the employee safe harbor. So that leaves us with the question of who has the burden of persuasion, the government or Mr. Hall? And the analysis there is pretty simple. The key question is whether the affirmative defense, in this case the employee safe harbor, tends to negate an element of the offense. And it is as clear as can be from this Court's decisions in Jobe and Hagan and from the relevant HHS regulations. Well, if it's an affirmative defense, definitionally it's on your side of the ledger. So clarify for us how you're acknowledging affirmative defense, but on the other hand, seeming to suggest somehow some inertia is on the government's side. Just unpack that for me. Maybe I'm missing. Yes, Your Honor. Affirmative defenses come in, for our purposes, I'll say two flavors. There are affirmative defenses where the defendant bears both the burden of production and the burden of persuasion. Insanity is an example of a defense like that. Then there are affirmative defenses where the defendant has the burden of production, but once that burden is satisfied, the burden shifts, the burden of persuasion shifts to the government to disprove the defense beyond a reasonable doubt. Self-defense is an example of that. Entrapment is an example of that. So the question here is, the safe harbors are unquestionably affirmative defenses, but which flavor are they? And the way you answer that question is by asking whether the safe harbors tend to negate an element of the offense. If they do, then as a matter of due process, the burden of persuasion rests on the government. If they do not, then in general, the burden of persuasion would rest on the defendant, which is where the district court placed it erroneously in our view. How do you articulate the affirmative defense in this case, the mechanics, not the substance involved, but where in do you say the affirmative defense gets triggered to move to then require the government to do something? Where in the scenario does your affirmative defense kick in so it then shifts something to the government? That's the part of the mechanics. Yes, Your Honor. As soon as the defendant satisfies his burden of production at trial, that's where the burden of persuasion shifts to the government. And the district court found that Mr. Hall, in fact, had satisfied his burden of production. He had produced enough evidence that the jury could rationally find in his favor on the employee safe harbor. Once he did that, the burden of persuasion, that is the burden of disproving the defense beyond a reasonable doubt, shifted to the government as a matter of due process. And that's because the employee... I'm sorry, Your Honor? The chief judge was trying to ask a question. I apologize. I'm sorry. No. I'm wondering about United States v. George in the Seventh Circuit. Is that a different test where the burden shifts to the defendant to demonstrate by a preponderance of the evidence that the conduct fell within the safe harbor portion of the statute? Is that a different approach? United States v. George does not take the position I'm advocating. There's no question about that. United States v. George is worth careful study, though, because the question for this court is, how persuasive is it? And if you read the briefs in United States v. George, and if you even go back to the district court record in that case, as far as I can tell, the burden of persuasion issue was never disputed. It was not disputed by the appellant in his brief. It was not disputed, of course, by the government. Even in the district court, it was a bench trial. And as far as I can tell, the issue was not litigated. So the argument that I'm making to this court today, that the safe harbors negate an element of the offense, and therefore, as a matter of due process, the burden of persuasion has to rest on the government, that argument was never made in George. So George does say what it says, and what it says is contrary to what I'm arguing. But the issue really was not presented there. And so I can't characterize it as dicta, but I can say that I don't think it's very persuasive precedent for this court. So would we create any type of circuit split, were we to go with your approach? Do you believe that Job and Hagen are clear enough that we've already crossed this bridge? I think you'd be creating a circuit split, but not much of a circuit split, because I think, again, if the Supreme Court, for example, were to look at an analysis along the lines of what I'm describing versus what happened in George, I don't think they would view George as particularly significant. If another court were to perform the analysis that I am urging here, and come to a different conclusion, that would be a true circuit split, but that I don't think this analysis has been performed by any appellate court, and I'm not sure it's been performed by any district court other than the court below here, and applied to the safe harbors and the anti-kickback context. Well, what about harmless error? I beg your pardon? Harmless error. Well, there are two levels of analysis there. The first is, can an error that misstates the burden of proof ever be harmless? And we argue in our briefs that it cannot be, under Sullivan versus Louisiana, and under United States versus Stanford, which is a case from this court. Neither is directly, squarely on point, but they're both pretty clear. If you can misinstruct the jury on the burden of proof, that is a structural error that can never be harmless. Well, as you said, you don't have a case that says that. I don't have a case that goes either way. Well, that's my point, and Judge Everard asked you, well, would it create a circuit split, the chief rather, but you don't have a case that said it. I mean, you make an eloquent and specific argument along that line, but Judge Jones' question to you was, what about harmless error? So, all this is subsumed within the overall jury instructions that the trial judge gave to the jury in this case. I mean, it can't be separated from that. So, assume in arguendo, error in harmless, as Judge Jones said, how would that have overall impacted the jury verdict in this case, given the charge? Now, I heard your argument about structural error. I got that part, but assuming that that doesn't get traction, where do you go from there? Here's where I go from there, Your Honor. The applicability of the employee safe harbor was the critical issue in this case. It was the critical issue in the case on the anti-kickback statute counts, and the district judge found in finding that Mr. Hall had satisfied his burden of production, the district judge found that a rational jury could find in his favor on that issue. So, once you get to that point, there's enough evidence for a jury rationally to find in his favor, and . . . And so, I'm sure you argued that, or somebody did at trial. So, once it's challenged to the jury, then they're required to make that determination. In this case, they didn't. So, how is that reversible error? Well, because that's not the harmless error standard. The harmless error standard is whether you can say, this court can say that the error is harmless beyond a reasonable doubt. And I always feel awkward telling the court what it can and can't do, but I don't think this court can substitute its judgment for the jury's judgment. Well, and back to you. I'm sorry? Back to you. That's the whole point. It's a jury-tried case. It has a number of instructions. All of this is channeled to the jury. You said, what a reasonable jury could determine, which means the jury has a choice. So, when all this was pushed to the jury, even assuming there's some error, how could the jury be required to come out where you say it did? Here's how I respond to that, Your Honor. The jury was misinstructed on the burden of proof. The jury was told Mr. Hall had the burden by a preponderance of the evidence. The jury should have been told that the government had the burden beyond a reasonable doubt. So, there was no jury verdict based on the proper burden of proof. So, the question is whether the court can say, beyond a reasonable doubt, that had it been properly instructed on the . . . So, you're saying this multi-day trial turned on the burden of production, burden of persuasion. That's what you're saying. This boils down to a multi-day trial, fought vigorously on both sides, a whole variety . . . I mean, admittedly, a complex set of . . . but this case turns on burden of production, burden of persuasion. Is that what you're  Absolutely, that's what I'm saying. I just want to make sure I understand . . . I tried the case, so . . . I figured that you did. That's exactly what I'm asking the question. We loved it when we had a trial lawyer. You can't say, well, I wasn't there. I didn't read the briefs. So, you know, I rather figured, even without asking you, that you were there. I was there. And, Your Honor, I can tell you with as much certainty as one can muster in these circumstances, this case turned on the employee safe harbor, the anti-kickback statute counts. There was a whole other count where Mr. Hall was acquitted. And the issue there was the applicability of the employee safe harbor. Mr. Hall testified about it. There was evidence presented of legal advice that had been received. There was the cooperators testified about it. It was hotly contested. And it was a close question. And I think the district court's finding that Mr. Hall satisfied his burden of production tells you that it was a close question. Well, that's just a finding. It's evidentially a finding that the judge made. So, to still come back, it's a jury case. And I know you argued that passionately, articulately to the jury, just the way you are here. But the jury had a choice. And so your, quote, burden here is to show how that's reversible error. But the choice the jury had was whether Mr. Hall had met his burden of proof by a preponderance of the evidence. That was the wrong choice. The choice the jury should have had is whether the government had proven beyond a reasonable doubt that Mr. Hall had not satisfied the employee safe harbor. And had the jury been confronted with that question, I believe, very strongly, we would have won this case. I think that was a decisive error. And it was decisive because it was the key issue in the case. It was hotly contested. And there was evidence on both sides. And in that circumstance, where the allocation of the burden of proof is critical, it's critical. That's why we have burdens of proof to deal with cases just like this, where the evidence is close. And by putting the burden on Mr. Hall, rather than on the government beyond a reasonable doubt, I believe the district court's error powerfully affected the verdict that was reached in the case. On that note, do you plan to say anything about the restitution, Matt? I mean, it's your time, but are you going to address anything else, the restitution order, or rest on your brief on those? The restitution point is pretty simple, and we'll rest primarily on our briefs on that. I guess, could you tell me if there's some case that says that the MVRA does not allow, based on all foreseeable losses, pursuant to a conspiracy? Because I think that, although we're sometimes persnickety about restitution, I think the MVRA does allow for this. And so I want to know what's your best case that says it doesn't. It allows for losses caused by a conspiracy. But the conspiracy here was not a conspiracy to violate the anti-kickback statute. It was a conspiracy to spend the money, the proceeds of a violation of the anti-kickback statute. And those are two different things. If it had been a conspiracy to violate the anti-kickback statute, then I think we wouldn't be challenging the restitution order. But when it's a conspiracy just to spend the proceeds, that spending of those proceeds that had already been obtained didn't cause any loss. That's the argument. And I think that's... And what's your best case for that limitation? The Huey case, I think, from the Supreme Court, is probably the best case on point. There isn't a lot that is directly on point, on the point that I'm arguing. But the principal in Huey, I think, controls it. Well, he wasn't a, that wasn't a conspiracy, was it? Huey, I don't recall whether it was a conspiracy, but I know Congress amended the statute after Huey to permit losses for conspiracies in the course of a conspiracy. So in that respect, Huey is different than the MVRA. But the basic principle in Huey is that the losses have to be caused by the offense of conviction. And the district court, by basing the restitution order on the money laundering count, I think went wrong. The losses, the restitution order should have been based on the anti-kickback statute counts and the amount that was... Yeah, I understand that point. I have never seen a restitution order of $59 million before. Yeah, it's a big one. It's ridiculous. Yeah, well, I respectfully agree. My red light is on. You have time for rebuttal. Thank you. Okay, Mr. Lang. Are you still employed, Mr. Lang? As of this morning, I am, Your Honor. All right, well, good. Good morning, Your Honors, and may it please the Court, Andrew Lang for the United States. The district court correctly instructed the jury regarding the anti-kickback statute offense, and any error with respect to that instruction was harmless. The district court also correctly ordered Hall to pay restitution in the amount of losses caused by conduct in furtherance of the money laundering conspiracy. This Court should therefore affirm. I'm pleased to say that I think my colleague and I share quite a lot of common ground when it comes to the bona fide employee defense. It is an affirmative defense. We agree the defendant at least bears the burden of production, and I think we agree with respect to the key legal issue for this Court to decide, which is whether the defendant ultimately bears the burden of persuasion. And under Dixon, the question there is whether the bona fide employee defense tends to negate an element of the anti-kickback statute offense. And the answer to that question, I think, straightforwardly, is no. It doesn't tend to negate an element. The kinds of defenses that Dixon talks about, that the Lefebvre Treatise talks about that we cite in our brief, are often defenses that tend to negate a mens rea element. Those are defenses that directly negate an element of the offense. So insanity, for example, giving bona fide legal representation, the defense that Close talks about, the 11th Circuit case in the briefing, those defenses directly negate the mens rea requirement of those offenses. So in those cases, with those types of defenses, it's ultimately the government's burden to prove the absence of those defenses because they go directly to an element. I think a good faith defense is also a good example of a defense like that. We often see defendants in fraud or other white collar cases requesting good faith instructions from district courts, and those instructions, although this Court doesn't have a pattern of good faith instruction, those instructions generally tell the jury good faith means, for example, the defendant did not have the intent to defraud, and the government ultimately still has to prove intent to defraud beyond a reasonable doubt. The anti-kickback statute is different. The elements of the anti-kickback statute are laid out in subsections B1 and B2 of the statute. It says, in essence, that it's a crime to offer or pay or solicit or receive remuneration to induce certain kinds of health care decisions, and whether or not that remuneration is paid to a bona fide employee doesn't change whether the elements of the statute are satisfied. The only reason that affirmative defense comes into play at all is because separately, in subsection B3 of the anti-kickback statute, Congress says, here are some defenses. These kinds of remuneration, these kinds of conduct are accepted from criminal liability. So in that way, the bona fide employee defense is just like the conviction defense that Champs-Edine talks about, which we discussed in our brief. It's like the kind of defense for which a defendant bears the ultimate burden of persuasion. So for those reasons, the district court's instruction correctly required the defendant to prove by a preponderance the satisfaction of the bona fide employee defense. And I agree that although there's not a lot of case law out there that really digs into the analysis on this question, we would encourage this court not to open up an unnecessary circuit split with the Seventh Circuit or to abrogate this court's own pattern instructions on the anti-kickback statute. With respect to harmless error, we would urge the court Before you get to harmless error, can you talk about Marchetti, the idea that the recipient of the remuneration needed to be in a position to refer for a duly influenced or acted on behalf of a person in such a position? Of course. So in Marchetti, of course, this court held that often in anti-kickback statute cases, including in Marchetti itself, the key question is whether a defendant was compensating advertisers or paying to induce referrals. And so the identity of the payee, I think this court said, while not dispositive, is often important, it's often helpful, and it'll be easier to infer an intent to induce a referral when you're paying a kickback to a doctor than, I think the example was to a rancher. So this court did make clear that the identity of the payee can be important, but later on in Marchetti when this court turned to the jury instructions, this court held that the instructions in Marchetti made quite clear that the payments have to be made in order to induce an unlawful referral. And those jury instructions were materially identical to the jury instructions that the district court gave in this case. They used this court's pattern. They drew content from the anti-kickback statute itself. So I don't think Marchetti can be read as standing for the proposition that the kind of instruction that Hall requested is required, although it's true that the identity of the payee may be relevant. We would also encourage the court, just as with the burden of persuasion issue, that this court could just as easily find that this error, if there was one, was also harmless. I think the evidence that the marketers were not bona fide employees was overwhelming. There were transcript pages of marketers as well as Scott Schuster, one of the co-owners of the pharmacies, testifying about their lack of control over the marketers' day-to-day activities. They didn't have the right to direct or control them. That's at page 3179 of the record. They do their own thing. They didn't give the marketers direction about when and where to go. They didn't give them tools or equipment. Did they work for anybody else? Some of the marketers were, I think they were called sub-reps. So some of the marketers worked for one another, but they didn't work for the pharmacies. They were paid kickbacks by the pharmacies, but they weren't their employees. The marketers themselves testified consistently with that. Michael Rennell at 3362 of the record testified that the pharmacies didn't supervise them. They didn't approve their vacation time. They didn't approve their benefits. So who paid the money to the doctors? The money to the doctors generally came from the marketers. For the benefits. Right. But it went through the pharmacies to the marketers to the doctors, right? Right. Exactly. So I believe the structure was that the pharmacies paid the marketers a percentage of the prescriptions that their doctors generated. And then at the same time, the marketers were finding different ways to provide financial incentives to the physicians. They took them on lavish trips to Las Vegas and other places. They paid them through these quote unquote managed service organizations, which were an attempt to paper over the fact that they were paying them for prescriptions. And one of the debated questions with respect to their employee status was the fact that at least at some point during the conspiracy, they started to get paid via W-2s. But as Rennell testified at 3366 to 69 of the record, the W-2 payment structure was merely legalese. The marketers understood that the pharmacies were just trying to paper over this non-employee relationship and nothing ever really changed in the day-to-day responsibilities of the marketers as a result. With that said, I'm also happy to talk about the restitution order, if this Court has questions on that subject. We agree that the MVRA not only authorizes but requires a restitution award for conduct in furtherance of a conspiracy. And I think the cases that we discuss in our brief clearly demonstrate that conduct can be in furtherance of a conspiracy or in the course of a conspiracy under this Court's recent cases in Shaw and Gutierrez-Avoscal, despite the fact that that conduct may not directly further an aim or an element of the conspiracy. And that's exactly what we have here. Conduct that produces proceeds to be laundered through a money laundering conspiracy is conduct in furtherance of or in the course of a conspiracy. So for those reasons, the District Court correctly imposed restitution here. Have you ever seen a $59 million restitution award? I don't believe I've seen a $59 million restitution award. I agree that it's quite substantial. The reason for that is that the kickback scheme was quite substantial. They targeted Tricare and a few other federal payers. Were these legitimate prescriptions? I don't think they were. And there was quite a bit of evidence over the course of the trial that these prescriptions were designed to maximize reimbursements. They got into this business in the first place. What is this, pain treatments or something? Compounded pain creams. So they put together different medications into a compounded formula. The reason that they did that is because they knew that Tricare would reimburse unusually generously for those compounded medications. And they designed those formulas to be as lucrative as possible. Dr. Jimenez, one of the witnesses who testified about the medical necessity or lack thereof of these formulas at page 3260, his review of the prescriptions led him to the conclusion that they were ineffective. At 3272, he said the dosing instructions appeared to be random. At 3277 to 78, he said that some of the prescriptions were facially nonsensical. The prescription pads that the pharmacies pre-printed included things like refills for scar creams, which makes no sense, or topical pain medications for migraines, which makes no sense. So yes, Your Honor, I think there was ample evidence that this was a kickback scheme from top to bottom and these creams were designed to maximize reimbursements, not to treat patients. And all of that conduct was properly before the district court when it ordered restitution. The final thing that I would point out on the subject of restitution is I agree, Your Honor, that this does create a significant increase in the restitution award. That's a consequence of the MVRA. That's mandatory restitution because it's conduct in furtherance of the money laundering conspiracy. And I would also make the observation that in Shaw, the delta between what the restitution would have been absent the private payers and what the restitution was, I believe was in the neighborhood of $27 million. So including that kind of conduct in furtherance of a conspiracy can have substantial effects on restitution, but that's required under the MVRA. Unless the court has additional questions about the jury All right. I guess we don't. Thank you. All right. Mr. Klein, rebuttal. A few quick points. First, I think we agree that the issue on the burden of persuasion is whether the safe harbors tend to negate an element. The element that the safe harbors tend to negate is the element of remuneration. And I think it's important to note that this court said in Job, the employee safe harbor provision modifies the definition of remuneration to exclude payments to bona fide employees. Hagen, HHS has promulgated safe harbor regulations that exclude certain types of remuneration from criminal liability. And an HHS regulation says almost exactly the same thing. There could not be a clearer example of an affirmative defense that tends to negate an element of the offense. My colleague identified the safe harbors as exceptions, but in Ruan the affirmative defense was an exception and the burden of persuasion was on the government. In Hagerty from this court, the affirmative defense was an exception and the burden of persuasion was on the government. In Kless, the case for the Eleventh Circuit that we cite . . . I don't see it. I've read and I have up here the transcript from the charge conference and so forth in which the trial court articulates about the safe harbor submissions. Clause 225 cites our patent instructions, cites our cases, etc. All these objections were made and I don't see and I haven't seen the brief where there's a case dead on that supports the argument you're making in terms of reversible error. I just don't see that in there. I hear what you're saying about burden of persuasion, burden of production. Nobody seems to disagree about those doctrines, but in terms of this case that was tried in reading the charge conference and the instructions and the objections, I'm missing what's the case that you have that supports what you're saying in terms of reversible error. And what I'm saying on the burden of persuasion is there's only one case, one appellate case that I know of out there that touches on this issue at all and that's the George case that we've discussed. So this court is riding on a clean slate. So then the question is what are the principles that govern the court's decision in riding on that clean slate? Those principles are very well established. They are that if the affirmative defense... Let me ask you, in a declarative sentence, tell me what it is you would say the holding of this court would be with respect to the argument you're making. The holding should be that the government bears the burden of persuasion on the AKS safe harbors by proof beyond a reasonable doubt because the safe harbors tend to negate the remuneration element of the AKS offense. That should be the holding of this court. And because the trial court didn't do that, reversible error, reversal of the jury verdict on all counts. That's what you would end it up with? That's how the case should come out. That was the error and the error is not harmless beyond a reasonable doubt if harmless error applies at all, which of course we dispute. All right, sir. Thank you very much. Thank you, Your Honor.